***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford, and the briefs and arguments before the Full Commission. Plaintiff has shown good grounds to reconsider the evidence. Accordingly, the Full Commission modifies the Opinion and Award of Deputy Commissioner Ledford and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties through the Pre-trial Agreement and at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over this matter.
2. All parties have been properly designated, and there is no question as to joinder or non-joinder of parties.
3. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
4. The date of injury for the accepted left knee claim is January 2, 2006.
5. The alleged date of injury for the denied right knee claim is January 2, 2006.
6. An employment relationship existed between Employee-Plaintiff and Employer-Defendant on January 2, 2006.
7. The Carrier-Defendant was the carrier on the risk on January 2, 2006.
8. Plaintiff's average weekly wage on January 2, 2006, was $628.48.
9. Pursuant to a Form 21 approved by the Industrial Commission on January 24, 2007, Plaintiff was paid $10,608.25 for a permanent partial impairment rating of 12.5% to his left knee.
10. All medical records and reports relating to treatment of Plaintiff's left knee and right knee claims may be submitted into evidence subject to each party's right to depose the medical providers.
11. All written discovery responses may be submitted into evidence.
12. Insurance coverage existed on the date of injury.
 *********** *Page 3 
As set forth in the Pre-Trial Agreement and this Opinion and Award, the Commission addresses the following:
 ISSUES
1. Whether Plaintiff is currently unable to earn wages in any employment or whether he is capable of performing the work currently assigned by Wal-Mart?
2. Whether Plaintiff's right knee condition is causally related to his left knee injury?
3. Whether Plaintiff is entitled to any other benefits under the North Carolina Workers' Compensation Act for this claim?
 ***********
Based upon the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff is 59 years old, having a date of birth of July 23, 1952. Plaintiff has a high school diploma and no other formal education. Prior to his employment with Defendant-Employer, Plaintiff worked as a delivery truck driver for farm supply company FCX for nineteen years, and then for Southern States for two and one-half years after that company acquired FCX. Plaintiff began working for Defendant-Employer in 1986 in the area of floor maintenance.
2. Prior to his injury, Plaintiff worked for Defendant-Employer as an "Overnight Maintenance Associate" leading an overnight floor maintenance crew. In this capacity, Plaintiff worked the third shift, from 10:00 p.m. to 7: 00 a.m., during which he would dust mop the floors, scrub the floors to remove old wax and debris with a scrubber machine, track mop the floors, and buff the floors with a buffer machine. The scrubber machine weighed approximately 800 pounds and the buffer machine weighed approximately 300 pounds. The wax packages weighed *Page 4 
approximately 50 pounds. Plaintiff changed the pads on both of the machines, which necessitated Plaintiff kneeling on his knees. Plaintiff and his crew were also responsible for replacing damaged tiles, which necessitated Plaintiff kneeling down and using a knife to remove the damaged tile, and then replacing it. It took Plaintiff approximately five minutes to replace a broken tile, and the number of tiles to be replaced varied from night to night.
3. On January 2, 2006, as acknowledged by the parties, Plaintiff suffered a compensable injury by accident when he slipped and fell while working on the floors, thereby injuring his left knee. Defendants accepted the compensability of this claim via an Industrial Commission Form 60.
4. On January 16, 2006, Plaintiff came under the care of Dr. Stephen Sladicka of Carolina Orthopedic Specialists. Dr. Sladicka diagnosed Plaintiff with left knee pain and left knee internal derangement. On March 8, 2006, Dr. Sladicka performed a left knee arthroscopy, a partial lateral meniscectomy, and medial meniscectomy and chondroplasty of the lateral femoral condyle and medial femoral condyle.
5. Following his surgery, Plaintiff returned to full-duty work with Defendant-Employer, but continued to report left knee pain. On June 28, 2006, Plaintiff reported to Dr. Sladicka that he would have pain after about four hours of work, that activity worsened his pain and that rest made it better. Dr. Sladicka ordered a steroid injection. On July 28, 2006, Dr. Sladicka diagnosed Plaintiff with bilateral degenerative joint disease, left greater than right. Dr. Sladicka released Plaintiff from his care with instructions to continue quad exercises, take Aleve as tolerated and to return as needed. On August 10, 2006, Dr. Sladicka assigned a permanent partial impairment rating of ten percent (10%) to Plaintiff's left leg. *Page 5 
6. On October 13, 2006, Plaintiff was seen by Dr. Jason Norcross of Hickory Orthopedic Center for a second opinion. Dr. Norcross assigned a permanent partial impairment rating of fifteen percent (15%) to Plaintiff's left knee.
7. On January 24, 2007, the Industrial Commission approved a Form 21 Agreement to pay Plaintiff $10,810.57 beginning on October 13, 2006, the date of his last rating. This payment consisted of $202.32 for underpayment of temporary total disability benefits and $10,608.25 for the average of the permanent partial impairment ratings given by Drs. Sladicka and Norcross.
8. On October 3, 2007, Plaintiff returned to Dr. Sladicka with complaints of left knee pain. Dr. Sladicka recommended a left total knee replacement. On April 7, 2008 Defendants filed a second Form 60 correcting the average weekly wage, and stating that Plaintiff's disability began on March 13, 2008 and that Plaintiff was still out of work. On May 23, 2008, Plaintiff underwent left total knee replacement surgery performed by Dr. Sladicka.
9. On July 17, 2008, Plaintiff returned to Carolina Orthopaedic Specialists for a postoperative follow-up visit. Plaintiff advised that his left knee was improving, but indicated that he was beginning to have pain in his right knee. Plaintiff was diagnosed with left knee status post total knee replacement and right knee pain.
10. Plaintiff continued to be seen in follow-up at Carolina Orthopaedic Specialists. A Patient Work Status Report dated September 2, 2008 indicated that Plaintiff was not able to return to work for four weeks. On September 30, 2008, Dr. Sladicka indicated that Plaintiff should not work a full 8-hour day. Plaintiff had returned to work as of the date of his next visit on December 9, 2008. *Page 6 
11. On July 14, 2008, Plaintiff was seen by Dr. David DuPuy for an Independent Medical Evaluation. Dr. DuPuy diagnosed Plaintiff with a left total knee replacement that was caused by his workers' compensation injury of January 2, 2006. Dr. DuPuy opined that Plaintiff's right knee symptoms were not related to his left knee condition, either due to his fall or by walking with a limp, but rather, they were related to Plaintiff's degenerative right knee arthritis.
12. Dr. DuPuy noted that, because Plaintiff was only 55 years of age at the time and morbidly obese, he could wear out the plastic component of the left prosthetic knee by the age of 75, and might require a revision to replace the plastic insert between the femoral and tibial metal components. Dr. DuPuy's assessment was that Plaintiff was capable of returning to employment. He found Plaintiff at maximum medical improvement and assigned a permanent partial impairment rating to Plaintiff's left leg of forty percent (40%) in consideration of the Industrial Commission rating guidelines.
13. Plaintiff returned to work following his left total knee replacement surgery. He attempted to use both the stripping and buffing machines, but had difficulty doing so because of his knee pain. During Plaintiff's December 9, 2008 visit with Dr. Sladicka, Plaintiff reported that he had returned to work but was having problems with the floor buffing machine and no longer wanted to operate it. Dr. Sladicka gave Plaintiff a permanent restriction of no operating of the buffing machine. On January 13, 2009, Plaintiff reported to Dr. Sladicka that he was having difficulty stripping floors at work, and he received a restriction of no stripping floors for the next four weeks.
14. On March 24, 2009, Plaintiff was evaluated by Dr. William VanNess, III, of The Pain and Rehab Institute for an Independent Medical Evaluation and second opinion on his *Page 7 
permanent partial impairment rating. Dr. VanNess concluded that Plaintiff's care appeared to have been excellent up to that point, and he found that Plaintiff's left knee was stable. Dr. VanNess also found Plaintiff at maximum medical improvement and recommended a permanent partial impairment rating of forty-five percent (45%) to his left leg. Dr. VanNess explained that he gave Plaintiff an additional 5% over the minimum 40% required by the Industrial Commission rating guide, due to Plaintiff's residual limitations, such as his limitations in range of motion.
15. In his initial report, Dr. VanNess stated that he was "unsure" whether Plaintiff's right knee complaints were directly related to his initial work injury and stated that he would defer to Dr. Sladicka's expertise and opinion in this regard. Dr. Van Ness subsequently testified that Plaintiff developed an antalgic gait, or limp, favoring the right lower extremity following extended activity. He opined that abnormal gait patterns can cause one to overwork certain muscles in one leg and underuse certain muscles in the other leg, which can promote further problems. Dr. VanNess recommended a Functional Capacity Evaluation (FCE) to fully assess Plaintiff's capabilities and to determine any permanent work restrictions.
16. On May 19, 2009, Plaintiff underwent an FCE conducted by John Andrews, DPT. The results of the evaluation indicated that Plaintiff could walk constantly and squat occasionally, with no kneeling. Plaintiff declined to participate in the kneeling examination due to his difficulties getting up and down from the kneeling position. Plaintiff's lifting was assessed at no lifting and carrying over 40 pounds on an occasional basis. The evaluator recommended that Plaintiff not perform any job activities requiring kneeling, and that he not be required to lift over 40 pounds. Dr. VanNess felt that Plaintiff should be restricted to walking occasionally, *Page 8 
rather than constantly. The Full Commission gives greater weight to the opinion of Dr. VanNess concerning Plaintiff's permanent restrictions over any contrary FCE results.
17. Based upon a preponderance of the evidence from the entire record, the Full Commission finds as fact, that due to his left total knee replacement and resulting conditions, Plaintiff has permanent restrictions of no use of the stripping or buffing machines, no work requiring kneeling or stooping and occasional walking, lifting and carrying of 40 pounds or less.
18. The medical evidence establishes that Plaintiff is morbidly obese, and his morbid obesity contributes to his bilateral knee problems. As Drs. VanNess and Sladicka testified, Plaintiff's obesity will most likely contribute to faster degeneration of his left total knee replacement.
19. The Full Commission finds by a preponderance of the evidence in view of the entire record, that while Plaintiff's left knee injury and his total knee replacement caused him to walk with a limp which contributed to some aggravation of Plaintiff's right knee condition, Plaintiff's accident and resulting left knee injury was not the cause of Plaintiff's right knee condition. Rather, Plaintiff's right knee condition was caused by degenerative osteoarthritis, which pre-existed his work injury. Plaintiff's work injury has not been established to be a significant aggravating factor of his right knee condition, such that any further medical treatment or surgery for Plaintiff's right knee would be required due to his left knee injury.
20. Plaintiff qualified for Social Security Disability benefits in September 2008 while out of work recovering from his left total knee replacement surgery. Plaintiff was also receiving temporary total disability benefits at that time. Plaintiff voluntarily chose to return to work for Defendant-Employer and to stop receiving Social Security Disability benefits. *Page 9 
21. Since returning to work for Defendant-Employer, Plaintiff has been unable to carry out the regular duties that were associated with his position prior to his injury, including operating the buffing and stripping machines. Plaintiff is also unable to perform prior duties that would require stooping and kneeling such as changing pads on the machines or replacing floor tiles. Plaintiff's job duties have been modified such that he is able to perform the task of mopping, while the other members of the crew run the buffing and stripping machines.
22. Plaintiff takes two to three Vicodin pills to get through his work shifts, but does not take Vicodin on days when he does not work. The Vicodin was prescribed by Dr. Sladicka. Plaintiff takes one Vicodin pill approximately thirty minutes before beginning his shift, a second pill approximately two hours after beginning his shift, and sometimes a third pill before finishing his shift. After Plaintiff has worked a full shift from 10:00 pm to 7:00 a.m., his knees tend to swell.
23. Plaintiff previously owned a farm where he raised beef cattle and grew produce. When he owned the farm, Plaintiff performed activities such as feeding cattle, and working on the property, driving cattle and using farm equipment and supplies. Due to the problems with his knees, Plaintiff can no longer perform many of these tasks, and he transferred ownership of the farm to his son as a result.
24. Judy Hawkins, personnel coordinator for Defendant-Employer, testified regarding the tasks associated with the maintenance associate position on the day and night shifts. Some of the duties associated with this position are duties which Defendant-Employer has assigned to Plaintiff. According to Ms. Hawkins, cleaning the floors is one duty associated with the maintenance associate position. She testified that the night maintenance associates are also *Page 10 
responsible for cleaning the grocery section, lounges, back offices, restrooms, lobbies, windows, and front sidewalk. They also collect the garbage and change light bulbs.
25. Plaintiff's testimony, which differs from that of Ms. Hawkins, and to which the Full Commission gives greater weight, shows that Plaintiff is not required to perform many of the duties associated with the night maintenance associate position including cleaning restrooms and taking out garbage. Rather, Plaintiff continues to perform the limited task of pushing mops, which was part of his pre-injury duties while working in floor maintenance
26. Certified rehabilitation counselor Maria Vargas was consulted by counsel for Plaintiff. Ms. Vargas met with Plaintiff to evaluate his transferable skills and discuss his then current job duties. Ms. Vargas did not review Defendant-Employer's job description for Plaintiff's position at that time. According to Ms. Vargas, who the Full Commission finds to be credible and competent, Plaintiff's pre-injury position most closely resembled that of a "floor waxer" as found in the Dictionary of OccupationalTitles.
27. Based on her understanding that Plaintiff's duties following his return to work consisted exclusively of using a track mop for thirty minutes and then pushing a dust mop for the remainder of his 10:00 p.m. to 7:00 a.m. shift, Ms. Vargas testified there would be no such positions available in the marketplace.
28. As stated above, Ms. Vargas had not reviewed the written job description for the night maintenance associate position as of the time she interviewed Plaintiff or as of the time that she made her report. Ms. Vargas first saw the written job description at her deposition. The duties of the night maintenance associate, as described in Stipulated Exhibit 3, include cleaning all areas of the facility, both inside and outside, cleaning floors, windows, restrooms, trash receptacles, and the dock area, and utilizing and maintaining floor-cleaning equipment including *Page 11 
scrubbers, waxers, and rug extractors. If the night maintenance associate position was modified to exclude the duties of cleaning the floor with equipment, the resulting position would be a janitorial job, which did exist in the marketplace and was contained in the Dictionary of Occupational Titles.
29. Ms. Vargas opined, however, that Plaintiff's ability to compete in the open market for employment is very poor. She testified, "So the types of jobs that he could get in his field such as janitorial or floor waxing or anything like that he would not be able to do." She further opined that his hourly wage of $15.95, plus time and a half for Sundays is very, very high for the type of unskilled work Plaintiff is currently doing. According to Ms. Vargas, unskilled, entry level janitor/cleaning type positions pay about $7.80 per hour. Plaintiff was not performing all of the duties of a janitor in his position at Defendant-Employer.
30. The Full Commission finds, based on the preponderance of the evidence in view of the entire record that, although Plaintiff is capable of performing some work within the restrictions given by Drs. VanNess and Sladicka, Plaintiff has not been required to perform all the tasks that would normally be associated with either a floor waxer or a janitor position in the general marketplace. Rather, Plaintiff's duties have been so modified in order to accommodate his restrictions as to render the job he performs, not available in the competitive job market. To that extent, the work which Plaintiff has performed upon his return to work is not suitable and is not an accurate measure of his true wage-earning capacity.
31. Although there is some evidence that it may be futile for Plaintiff to seek suitable employment, in this record neither party has had sufficient opportunity to address all of the issues relating to the extent of Plaintiff's disability due in part to the fact that Plaintiff has continued to perform some work and has been receiving the same wages. *Page 12 
32. As of March 24, 2009, Plaintiff had reached maximum medical improvement with regard to his left knee injury. Of the physicians who examined Plaintiff and provided him with a permanent partial impairment rating for his left knee, the Full Commission finds that the best assessment of Plaintiff's permanent impairment is the 45% rating provided by Dr. VanNess.
33. The Full Commission finds based on the preponderance of the evidence in view of the entire record that, although Plaintiff has reached maximum medical improvement for his left knee condition, due to his left total knee replacement and his morbid obesity, Plaintiff is at risk for requiring future medical treatment for his left knee.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On January 1, 2006, Plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with Defendant-Employer, causing injury to his left knee. N.C. Gen. Stat. § 97-2(6).
2. In Peoples v. Cone Mills Corp.,316 N.C. 426, 342 S.E.2d 798, (1986), the North Carolina Supreme Court stated:
 If the proffered employment does not accurately reflect the person's ability to compete with others for wages, it cannot be considered evidence of earning capacity. Proffered employment would not accurately reflect earning capacity if other employers would not hire the employee with the employee's limitations at a comparable wage level. The same is true if the proffered employment is so modified because of the employee's limitations that it is not ordinarily available in the competitive job market.
Id. at 438, 342 S.E.2d at 806. *Page 13 
3. In the instant case, the position offered to Plaintiff by Defendant-Employer upon his return to work was so modified that it was not ordinarily available in the competitive job market and did not constitute suitable employment. Id. As such, Plaintiff's performance of that job is not evidence of his earning capacity.Id. Furthermore, should Plaintiff determine that he can no longer perform his job for Defendant-Employer, leaving his current employment will not constitute a refusal to accept suitable employment. Id.
4. Under the Workers' Compensation Act, disability is defined as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." N.C. Gen. Stat. § 97-2(9). In order to support a conclusion of disability, Plaintiff must show: (1) he was incapable after his injury of earning the same wages he had earned before his injury in the same employment; (2) he was incapable after his injury of earning the same wages he had earned before his injury in any other employment; and (3) his incapacity to earn was caused by his injury. Hilliard v. Apex Cabinet Co.,305 N.C. 593, 594, 290 S.E.2d 682, 683 (1982). A determination of whether a worker is disabled focuses on the injured employee's diminished capacity to earn wages, rather than upon his physical impairment. Peoples v. Cone Mills Corp.,316 N.C. 426, 342 S.E.2d 798 (1986). The employee has the burden of proving the existence and extent of his disability, Hall v.Chevrolet Co., 263 N.C. 569, 139 S.E.2d 857 (1965), and he may meet this burden in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to *Page 14 
seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury. Russell v. Lowes Prod. Distrib.,108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993). Plaintiff has shown that as a result of his injury he is incapable of performing his pre-injury job. However, since the medical evidence indicates that Plaintiff is capable of performing some work and he has remained employed in some capacity (although the job is unsuitable), the parties have not had sufficient opportunity on this record to address the extent of Plaintiff's disability.
5. In its discretion, the Full Commission concludes that this matter should be remanded to Chief Deputy Commissioner Wanda Blanche Taylor for assignment to a Deputy Commissioner for the taking of additional evidence on the extent of Plaintiff's disability.
6. Plaintiff's average weekly wage of $628.48 yields a weekly compensation rate of $419.00. N.C. Gen. Stat. § 97-2(5).
7. Plaintiff has reached maximum medical improvement with regard to his left knee injury and has sustained a 45% permanent partial impairment to his left leg. Plaintiff is entitled to elect the more favorable remedy once the extent of his disability is determined.Gupton v. Builders Transport,320 N.C. 38, 357 S.E.2d 674 (1987).
8. Defendants have accepted Plaintiff's left knee injury as compensable and are responsible for payment of all related reasonably necessary medical expenses, including any future medical expenses. N.C. Gen. Stat. §§ 97-2(19), 97-25.
9. Although Plaintiff's left knee injury and resulting change in gait caused some aggravation of his right knee, the preponderance of the medical evidence fails to establish that Plaintiff's ongoing right knee problems were caused by his injury by accident, rather than his pre-existing arthritic condition. Accordingly, Plaintiff's claim for medical treatment for his right *Page 15 
knee must be denied. Click v. Pilot Freight Carriers, Inc.,300 N.C. 164, 265 S.E.2d 389 (1980); Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d 750 (2003).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for medical compensation related to his right knee is DENIED.
2. Defendants shall pay for all reasonably necessary medical treatment related to Plaintiff's compensable left knee injury, including future treatment that may be necessary, according to procedures adopted by the Industrial Commission.
3. IT IS ORDERED that this matter is remanded to Chief Deputy Commissioner Wanda Blanche Taylor for assignment to a Deputy Commissioner for the taking of additional evidence on the extent of Plaintiff's disability. The Deputy Commissioner assigned to this matter will determine whether further deposition testimony is needed. The Deputy Commissioner shall gather the evidence, order a transcript and forward same to the Full Commission for a determination of the remaining issues. The parties may also by stipulation agree to reserve disability issues until a subsequent Form 33 Request for Hearing is filed by either party.
4. Defendants shall pay the costs, including all expert witness fees.
This the ___ day of September, 2011.
 S/_____________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________________ DANNY L. McDONALD COMMISSIONER
 S/_____________________ STACI MEYER COMMISSIONER *Page 1